JS 44   (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DEPUY SYNTHES SALES, INC.,
325 Paramount Drive,
Raynham, MA 02767

**(b)** County of Residence of First Listed Plaintiff   Bristol
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Anthony B. Haller, Esquire, Blank Rome LLP, 130 N. 18th Street, One Logan Square, Philadelphia, PA 19103, 215-569-5690

## DEFENDANTS

Globus Med. Inc. 2560 General Armistead Ave Audubon PA; Michael Foley,148 Havens Mill Rd. Freehold NJ;Jeremy Leary 19 S. Tamarack Dr., Brielle, NJ; and Michael Valeri, 107 Dickman Dr., Lavallette NJ

County of Residence of First Listed Defendant   Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)
Brief description of cause:
Breach of Fiduciary Duty; Breach of Contract; Aiding and Abetting; Tortious Interference; Unfair Comp; Conspiracy

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ *Preliminary Injunction*

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
03/09/2017

SIGNATURE OF ATTORNEY OF RECORD
*Anthony B Haller*

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEPUY SYNTHES SALES, INC.,<br>325 Paramount Drive,<br>Raynham, MA 02767; | : | |
| | : | |
| Plaintiffs, | : | CASE NO.: |
| | : | |
| v. | : | |
| | : | |
| GLOBUS MEDICAL INC.,<br>2560 General Armistead Avenue,<br>Audubon, PA 19403; | : | JURY TRIAL DEMANDED |
| | : | |
| MICHAEL FOLEY,<br>148 Havens Mill Road,<br>Freehold, NJ 07728; | : | |
| | : | |
| JEREMY D. LEARY,<br>19 South Tamarack Drive,<br>Brielle, NJ 08730; and | : | |
| | : | |
| MICHAEL VALERI,<br>107 Dickman Drive,<br>Lavallette, NJ 08735, | : | |
| | : | |
| Defendants. | : | |

### VERIFIED COMPLAINT

Plaintiff DePuy Synthes Sales, Inc. ("DePuy Synthes") files this Verified Complaint against Defendants Globus Medical Inc. ("Globus"), Michael Foley ("Foley"), Jeremy D. Leary ("Leary"), Michael Valeri ("Valeri") (collectively, the "Defendants"), and in support thereof avers as follows:

### INTRODUCTION

1.      This case involves a concerted, unlawful effort by DePuy Synthes' direct competitor, Globus, to raid DePuy Synthes of its talent and to exploit and ultimately convert

DePuy Synthes' customer relationships and goodwill to Globus by directly and purposefully interfering with the contractual obligations Foley, Leary, and Valeri (the "Sales Consultants") owed and continue to owe to DePuy Synthes and violating the Defendants' common law obligations to DePuy Synthes.

2.  DePuy Synthes is a worldwide leader in the design, manufacture, and sale of medical devices, including instrumentation and implants used in orthopedic and other surgeries.

3.  Globus is one of DePuy Synthes' direct competitors and has, throughout its history, engaged in unfair competition aimed at poaching DePuy Synthes' employees in an effort to replicate DePuy Synthes' operations and convert DePuy Synthes' customer relationships, good will, and confidential information.  For instance, just last month this Court enjoined a former Area Vice President of DePuy Synthes from commencing employment with Globus as part of Globus's effort to expand its business into the trauma market.

4.  The Sales Consultants Globus has more recently poached worked in the DePuy Synthes business division that specializes in the design, manufacture, marketing, and sale of instrumentation and implants used in spinal surgeries.  During their employment with DePuy Synthes, the Sales Consultants worked collaboratively as a team.  Valeri served as the team leader and managed the DePuy Synthes spine business in the Jersey Coast and Central Jersey territories, working directly with Foley and Leary.  The Sales Consultants were responsible for selling DePuy Synthes' products to various health care providers in central and coastal New Jersey and for establishing, nurturing, and enhancing key relationships with physicians and hospital personnel who play a critical role in determining the implants and instrumentation used in surgeries.

5.     Upon information and belief, the Sales Consultants initially planned to join Globus beginning in or around February 2016.  But they remained employed by DePuy Synthes throughout 2016, delaying their resignations until February 2, 2017, when they collectively notified DePuy Synthes of their resignations.  Despite initially suggesting they intended to comply with their two-week notice and transition obligations to DePuy Synthes, the Sales Consultants soon thereafter informed DePuy Synthes that they had been "advised heavily against" remaining with DePuy Synthes for transition and to instead terminate their relationship with DePuy Synthes and begin working for Globus immediately.  As a result, the Sales Consultants' last working day at DePuy Synthes was February 3, 2017.

6.     DePuy Synthes requires all of its sales employees, including the Sales Consultants, to execute an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement including the following obligations, among others:

   a.     a prohibition on *directly or indirectly* doing anything during their employment with DePuy Synthes to impair DePuy Synthes' business or customer relationships, including informing customers of future employment or services, competing products or services, or recruiting or soliciting fellow DePuy Synthes employees to join a competitor;

   b.     a prohibition on *directly or indirectly* competing with DePuy Synthes in assigned sales territories both during their employment with DePuy Synthes and for an eighteen-month period following the termination of their employment, including from assisting others in such competition;

   c.     a prohibition on *directly or indirectly* contacting, soliciting, or servicing DePuy Synthes customers for which they had any responsibility or with which they had any contact both during their employment with DePuy Synthes and for an eighteen-month period following the termination of their employment, including from assisting others in such contact, solicitation, or servicing;

   d.     a prohibition on disclosing or using DePuy Synthes' confidential information and business information about DePuy Synthes' customers that is not publicly known and was obtained by them in connection with their employment with DePuy Synthes; and

3

    e.    a commitment to provide DePuy Synthes with two-weeks' notice of a resignation to facilitate a smooth transition of case coverage and responsibilities, to minimize any disruption of patient care, and to ensure compliance with fiduciary and contractual obligations, especially in the context of employees joining DePuy Synthes' competitors.

7.    Based upon the coordinated nature of their resignations, the loss of business in the aftermath of their resignations (despite assurances from Globus that the Sales Consultants had not begun their employment with Globus), the Sales Consultants' refusal to provide two-weeks' notice and transition, as well as upon information and belief, the Sales Consultants had engaged in unlawful solicitation of customers and competition, including the preparation of their post-employment competitive tactics, well in advance of their resignations on February 2, 2017 and the termination of their employment with DePuy Synthes on February 3, 2017.

8.    The Sales Consultants unlawful pre-resignation conduct has served as a springboard for their current tactics, with Foley and Leary, upon information and belief, swapping territorial responsibilities during at least their initial employment with Globus and facilitating and assisting others with customer solicitations and case coverage in Foley's and Leary's former DePuy Synthes sales territories, including, several surgical cases scheduled with DePuy Synthes that were abruptly and conveniently converted to Globus on or about February 6, 2017—one business day after the Sales Consultants' coordinated resignations.

9.    In response to DePuy Synthes' initial demands, the Defendants committed to hold off on the Sales Consultants' interactions with customers in the field for a two-week period through February 17, 2017.  That period was designed to allow DePuy Synthes to attempt to reach an agreement with the Defendants regarding the Sales Consultants' employment with Globus and the Defendants' compliance with the Sales Consultants' contractual obligations under the Agreements.  The parties were unable to reach an agreement, based, in large part, on

4

Globus's lack of transparency and apparent parsing of contractual obligations. Consequently, the Sales Consultants re-commenced employment in their new sales roles with Globus on or about February 20, 2017. Despite the Defendants' two-week commitment to restrain the Sales Consultants' interactions with customers in the field, irreparable damage has already been inflicted, including, without limitation, the conversion of sales beginning on or before February 6, 2017.

10.   For its part, Globus has, at all material times, interfered with the contractual and fiduciary obligations the Sales Consultants owed and continue to owe to DePuy Synthes and aided and abetted in the breaches of those obligations.

11.   Collectively, the Defendants have engaged in unfair competition by orchestrating a scheme to hire away three of DePuy Synthes' New Jersey employees with full knowledge of their obligations owed to DePuy Synthes.

12.   The Defendants' conduct has inflicted and will continue to inflict significant and irreparable harm on DePuy Synthes, and that harm cannot be fully measured and calculated or compensated through monetary damages alone. Consequently, DePuy Synthes now files this Verified Complaint to remedy the harms caused by the Defendants' unlawful competitive activities through, among other remedies, an award of damages, attorney's fees and costs, and interim and permanent equitable relief, including preliminary injunctive relief to enforce the Sales Consultants' compliance with their contractual obligations to DePuy Synthes and restore the *status quo ante*—that is, the status before the Defendants' violations and interference with the Sales' Consultants' contractual and fiduciary obligations to DePuy Synthes.

## PARTIES

13.     Plaintiff DePuy Synthes Sales, Inc. is a Massachusetts corporation with its principal place of business in Raynham, Massachusetts at 325 Paramount Drive.  DePuy Synthes Sales, Inc. is registered to do business in the Commonwealth of Pennsylvania and maintains operations in the Commonwealth of Pennsylvania in Chester County.

14.     Defendant Globus Medical Inc. is a Delaware corporation with its principal place of business in Audubon, Pennsylvania at 2560 General Armistead Avenue.  Upon information and belief, Globus's Pennsylvania operations include not only management of its business but also all functions supporting its business and the development, manufacture, and sale of its competitive surgical implants and instrumentation, including the business and products for which the Sales Consultants are now employed by Globus.  Upon information and belief, revenue generated by the sales of Globus's surgical implants and instrumentation, including that generated by the Sales Consultants who are now employed by Globus, is earned and paid in the Commonwealth of Pennsylvania, and compensation paid to the Sales Consultants by Globus, including any commissions, is managed and paid by Globus from Pennsylvania.

15.     Upon information and belief, Defendant Michael Foley is a citizen of New Jersey and maintains a residence at 148 Havens Mill Road, Freehold, New Jersey 07728.  Foley was formerly employed by a DePuy Synthes distributor headquartered in Reading, Pennsylvania, Spinal Concepts, and he signed his Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "Employee Agreement") with DePuy Synthes in West Chester, Pennsylvania in November 2014 while meeting with DePuy Synthes' management to discuss and implement the transition of DePuy Synthes distributors to a direct sales force employed by DePuy Synthes.  After discussions with DePuy Synthes' direct competitor Globus,

6

which is headquartered and has its principal place of business in Audubon, Pennsylvania in this judicial district, Foley recently accepted employment as a sales representative for Globus.

16.   Upon information and belief, Defendant Jeremy D. Leary is a citizen of New Jersey and maintains a residence at 19 South Tamarack Drive, Brielle, New Jersey 08730.  Leary was formerly employed by a DePuy Synthes' predecessor in interest, Synthes USA Sales, LLC, which maintained its principal place of business in West Chester, Pennsylvania and signed his Employee Agreement with DePuy Synthes in November 2014 while meeting with DePuy Synthes' management to discuss and implement the transition of DePuy Synthes distributors to a direct sales force employed by DePuy Synthes.  After discussions with DePuy Synthes' direct competitor Globus, which is headquartered and has its principal place of business in Audubon, Pennsylvania in this judicial district, Leary recently accepted employment as a sales representative for Globus.

17.   Upon information and belief, Defendant Michael Valeri is a citizen of New Jersey and maintains a residence at 107 Dickman Drive, Lavallette, New Jersey 08735.  Valeri was formerly employed by a DePuy Synthes distributor headquartered in Reading, Pennsylvania, Spinal Concepts, and he signed his Employee Agreement with DePuy Synthes in West Chester, Pennsylvania in November 2014 while meeting with DePuy Synthes' management to discuss and implement the transition of DePuy Synthes distributors to a direct sales force employed by DePuy Synthes.  After discussions with DePuy Synthes' direct competitor Globus, which is headquartered and has its principal place of business in Audubon, Pennsylvania in this judicial district, Foley recently accepted employment as a sales representative for Globus.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties.  DePuy Synthes is a citizen of a different state from any of the Defendants, and the amount in controversy, to the extent measured and calculable by monetary damages, exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     This Court has personal jurisdiction over the Defendants.  Globus is a citizen Pennsylvania with, upon information and belief, Pennsylvania operations including not only management of its business but also all functions supporting its business and the development, manufacture, and sale of its competitive surgical implants and instrumentation, such as the business and products for which the Sales Consultants are now employed by Globus.  Upon information and belief, revenue generated by the sales of Globus's surgical implants and instrumentation, including that generated by the Sales Consultants who are now employed by Globus, is earned and paid in the Commonwealth of Pennsylvania, and compensation paid to the Sales Consultants by Globus, including any commissions, is managed and paid by Globus from Pennsylvania.  The contractual obligations and the employment and fiduciary relationships that are the basis of this lawsuit were formed in West Chester, Pennsylvania, where the Sales Consultants each executed the Employee Agreements.  Foley and Valeri also each previously worked for a DePuy Synthes distributor headquartered in the Commonwealth of Pennsylvania before DePuy Synthes' integrated that distributor's sales force into DePuy Synthes at the time the Sales Consultants signed the Employee Agreements.  Upon information and belief, the Sales Defendants communicated to, from, and within the Commonwealth of Pennsylvania regarding their employment with Globus, which is the subject of this lawsuit.  Upon information and belief,

8

assets that are the subject of equitable remedies are located in the Commonwealth of Pennsylvania, including revenues generated and received by Globus in Pennsylvania and resulting profits which are subject to an accounting, disgorgement, and constructive trust. Upon information and belief, Globus is indemnifying the Sales Consultants for their fees and costs incurred in connection with this litigation, rendering the Defendants closely related and/or in privity.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the DePuy Synthes' claims occurred in this judicial district and because assets that are the subject of equitable remedies are located in the Commonwealth of Pennsylvania.

## FACTS SUPPORTING VERIFIED COMPLAINT

### DePuy Synthes Is a Leader in the Highly Competitive Medical Device Industry

21.     DePuy Synthes is a worldwide leader in the highly competitive medical device industry, and designs, manufactures, markets, and sells medical implants and instrumentation such as plates, screws, rods, and other devices used in orthopedic surgeries for internal fixation of broken bones and for spinal and facial surgery.

22.     The medical device business is highly competitive, and the protection of DePuy Synthes' confidential information, customer relationships, and goodwill are vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage and from exploiting the investments DePuy Synthes has made in not only research and development but also the formation and expansion of customer relationships and the recruitment, training, and development of a knowledgeable sales force.

9

23.    DePuy Synthes markets and sells its products through a sales force that is comprised primarily of sales consultants who are assigned to specific territories and, in many instances, work with and under team leaders for those territories.

24.    DePuy Synthes generally pays its sales force on a commission basis. Although the commissions earned by sales consultants are variable from year to year as a result of variability in pricing and usage, where external factors adversely impact a sales consultant's expected compensation, DePuy Synthes regularly works with sales consultants to provide incentives and enhanced commissions to incentivize growth within their assigned territories and, in some instances, to offset the impact of pricing or territory expansions on total compensation.

25.    Sales consultants are expected to assist surgeons in the operating room when DePuy Synthes' products are used. Accordingly, sales consultants' relationships with their physician Customers are among the key factors necessary to grow and maintain DePuy Synthes' business.

26.    DePuy Synthes' customers include any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons such as, without limitation, group purchasing organizations or integrated delivery networks, health systems, hospitals and surgery centers and their materials management, operating room, sterile processing, purchasing, and related personnel, and physicians and their partners, employees, and staff nurses (collectively, the "Customers" and each a "Customer").

27.    DePuy Synthes invests significant time, effort, and money to develop its confidential information, training programs, Customer relationships, and related goodwill. To

10

protect its investment, DePuy Synthes requires all sales employees to sign the Employee Agreement, which contain obligations, subject to reasonable temporal limitations, that protect against the use or disclosure of confidential information (such as sales and marketing strategies, distribution details, business planning and development, financial information, pricing, sales volume or strategies, and purchasing histories), the solicitation and servicing of DePuy Synthes' Customers, the solicitation of DePuy Synthes' employees to leave their employment, disloyalty during employment, and the efficient transition of responsibilities in the event of a termination. And in exchange for executing the Employee Agreement, DePuy Synthes promises to provide and does provide its employees with access to its confidential information, training programs, customer relationships, and related goodwill.

<b><u>Globus' History of Unfair Competition with DePuy Synthes</u></b>

28.     Globus and DePuy Synthes are direct competitors.

29.     Globus' founding was the subject of three years of federal litigation and involved allegations that Globus and two of its top executives, who were former DePuy Synthes employees, stole DePuy Synthes' trade secrets and confidential information and tortiously interfered with and aided and abetted DePuy Synthes' employees in violating contracts similar to those executed by the Sales Consultants.

30.     That litigation settled during trial in August 2007 through a resolution that included Globus' agreement not to hire any DePuy Synthes employees for one year.  But soon thereafter, Globus continued its pattern and practice of poaching DePuy Synthes employees and assisting them in violating their agreements with and obligations to DePuy Synthes.

31.     Globus' improper conduct then became the subject of at least six state and federal lawsuits, culminating in a global settlement of all claims on September 23, 2010, whereby

11

Globus agreed, among other things, to: (i) pay a substantial sum of money to DePuy Synthes; (ii) honor DePuy Synthes sales employees' post-employment covenants in all respects; and (iii) provide DePuy Synthes with a "Notice of Hire" to inform DePuy Synthes each time it hired a former DePuy Synthes employee.

32.     Following DePuy Synthes' merger with and into a subsidiary of the Johnson & Johnson family of companies on June 14, 2012, however, Globus reverted to the predatory and unlawful conduct it had employed from its inception, and, since that merger, Globus and its distributors have poached a number of DePuy Synthes employees, including some cases that are still currently being litigated.   Indeed, as recently as January 2017, this Court enjoined a former DePuy Synthes Area Vice President from joining Globus' Trauma Division to prevent violations of the former Area Vice President's contractual and common law obligations to DePuy Synthes.

33.     The recruitment and hiring of the Sales Consultants in February 2017 are—at least insofar as DePuy Synthes is aware—the most recent employment of Globus' unlawful practice of hiring DePuy Synthes employees in violation of their contractual and common law obligations to DePuy Synthes.

### The Sales Consultants' Employment with DePuy Synthes

34.     Foley was a sales consultant in the spine division of DePuy Synthes' business, and was assigned the Central Jersey territory, which encompasses a variety of Customers, including, but not limited to, John F. Kennedy Medical Center, Robert Wood Johnson University Hospital, University Surgery Center, and Saint Peter's University Hospital and the physicians and staff affiliated with those locations.  As part of his role as sales consultant, Foley also was expected to provide coverage for surgeries scheduled at accounts assigned to other DePuy Synthes sales consultants.

35.     DePuy Synthes hired Foley as a sales consultant on or about November 14, 2014, when he met with DePuy Synthes' sales management in West Chester, Pennsylvania to discuss his role and responsibilities, the transition to a direct sales model from his previous employment with Spinal Concepts (a contracted DePuy Synthes distribution company), and the execution of the Employee Agreement presented to him during the meeting, which he signed.

36.     Leary was a sales consultant in the spine division of DePuy Synthes' business, and was assigned the Jersey Coast territory, which encompasses a variety of Customers in and around the eastern coast of New Jersey, including, but not limited to Bayshore Community Hospital, Jersey Shore University Medical Center, Monmouth Medical Center, Ocean Medical Center, Riverview Medical Center, Southern Ocean Medical Center, and Surgicare Surgical Associates of Freehold,  and the physicians and staff affiliated with those locations.  As part of his role as sales consultant, Leary also was expected to provide coverage for surgeries scheduled at accounts assigned to other DePuy Synthes sales consultants.

37.     DePuy Synthes hired Leary as a sales consultant on or about November 14, 2014, when he met with DePuy Synthes' sales management in West Chester, Pennsylvania to discuss his role and responsibilities, the transition to a direct sales model from his previous employment with Spinal Concepts (a contracted DePuy Synthes distribution company), and the execution of the Employee Agreement presented to him during the meeting, which he signed.

38.     Valeri served as the team leader for the Central Jersey and Jersey Coast territories working in collaboration with Foley and Leary and having shared responsibility for the Customers in those territories.  As part of his role as sales consultant and team leader, Valeri also was expected to provide coverage for surgeries scheduled at accounts assigned to other DePuy Synthes sales consultants.

13

39.     DePuy Synthes hired Valeri as a sales consultant on or about November 14, 2014, when he met with DePuy Synthes' sales management in West Chester, Pennsylvania to discuss his role and responsibilities, the transition to a direct sales model from his previous employment with Spinal Concepts (a contracted DePuy Synthes distribution company), and the execution of the Employee Agreement presented to him during the meeting, which he signed.

40.     The Sales Consultants worked collaboratively regarding business in the team's territories, business planning and strategy, Customer engagement, and competitive threats and responses.

41.     By virtue of the Sales Consultants' roles on that team and as DePuy Synthes' sales consultants, they had access to confidential information related to the business in the team's territories and beyond, including, without limitation, periodic and year-end sales data, performance rankings, sales by pathology and product line, and customer or GPO-specific pricing and discounts as well as information related to DePuy Synthes' research and development plans and strategy and sensitive discussions between DePuy Synthes and DePuy Synthes' Customers related to the development and rollout of new products and the refinement of existing products.  Upon information and belief, some of this confidential information was transmitted to the Sales Consultants' personal email accounts and, therefore, may remain in their possession today as they work to benefit a direct competitor by targeting DePuy Synthes' Customers.

42.     In connection with DePuy Synthes' transition to a direct-sales model and the termination of its distribution relationship with Spinal Concepts and to protect the Customer relationships and goodwill belonging to DePuy Synthes, Spinal Concepts assigned all rights it had in any agreements with Foley, Leary, and Valeri, including, but not limited to, any rights in

non-competition and non-solicitation obligations owed to Spinal Concepts and confirmed the assignment of all rights and intangibles, including goodwill associated with Customers, to DePuy Synthes.

43.     The Sales Consultants received specialized training on the technical aspects of DePuy Synthes' products and the medical procedures in which these products are used; techniques for educating operating room personnel and surgeons so that they could be resources on the technical aspects of DePuy Synthes' products during medical procedures; and the use of new and existing implants and instrumentation, as well as information regarding DePuy Synthes' contract and sales administration, personnel, and other departments.

44.     DePuy Synthes also provided the Sales Consultants with access to confidential information about DePuy Synthes' Customers and business activities, including information pertaining to pricing, marketing, and sales strategies, competitive responses, and product development research, pipelines, and release schedules, incentives, and strategies that they would not have obtained but for their work for DePuy Synthes and their execution of the Employee Agreements.  In his role as team leader, Valeri was also privy to confidential business information pertaining to not only the accounts within his assigned territories but also accounts outside of his assigned territories, including sensitive pricing information electronically compiled in a format pertaining to specific territories, accounts, and products with specific pricing and discount information.

45.     The Sales Consultants worked collaboratively regarding business in the team's territories, business planning and strategy, Customer entertainment and engagement, and competitive threats and responses.  And, by virtue of the Sales Consultants' roles on that team and as DePuy Synthes' sales consultants, they had access to confidential information related to

15

the business in the team's territories and beyond, including, without limitation, periodic and year-end sales data, performance rankings, sales by pathology and product line, and customer or GPO-specific pricing and discounts as well as information related to DePuy Synthes' research and development plans and strategy and sensitive discussions between DePuy Synthes and DePuy Synthes' Customers related to the development and rollout of new products and the refinement of existing products.   Upon information and belief, some of this confidential information was transmitted to the Sales Consultants' personal email accounts and, therefore, may remain in their possession today as they work to benefit a direct competitor by targeting DePuy Synthes' Customers.

46.     In order to build off of DePuy Synthes' significant investments in research and development, training, and confidential information, DePuy Synthes also provided the Sales Consultants with direct access to DePuy Synthes' Customer relationships and made them responsible for maintaining, nurturing, and developing those Customer relationships and growing DePuy Synthes' business by establishing or re-establishing relationships with other Customers in their assigned territories.

47.     To protect all of these investments as well as DePuy Synthes' Customer relationships and good will, DePuy Synthes required the Sales Consultants, like other DePuy Synthes sales employees, to enter into the Employee Agreements as a condition of their employment with DePuy Synthes.

48.     The Employee Agreements include the following obligations, among others designed and used to protect DePuy Synthes' legitimate business interests:

      a.      a prohibition on *directly or indirectly* doing anything during their employment with DePuy Synthes to impair DePuy Synthes' business or customer relationships, including informing customers of future

employment or services, competing products or services, or recruiting or soliciting fellow DePuy Synthes employees to join a competitor;

b.    a prohibition on *directly or indirectly* competing with DePuy Synthes in assigned sales territories both during their employment with DePuy Synthes and for an eighteen-month period following the termination of their employment, including from assisting others in such competition;

c.    a prohibition on *directly or indirectly* contacting, soliciting, or servicing DePuy Synthes customers for which they had any responsibility or with which they had any contact both during their employment with DePuy Synthes and for an eighteen-month period following the termination of their employment, including from assisting others in such contact, solicitation, or servicing;

d.    a prohibition on disclosing or using DePuy Synthes' confidential information and business information about DePuy Synthes' customers that is not publicly known and was obtained by them in connection with their employment with DePuy Synthes; and

e.    a commitment to provide DePuy Synthes with two-weeks' notice of a resignation to facilitate a smooth transition of case coverage and responsibilities, to minimize any disruption of patient care, and to ensure compliance with fiduciary and contractual obligations, especially in the context of employees joining DePuy Synthes' competitors.

49.    The Employee Agreements are part of a larger effort by DePuy Synthes to protect its confidential information and the investments it makes in research and development, training, Customer relationships, and goodwill, including, without limitation, obtaining patent protection when available, maintaining physical and electronic limitations or barriers to access business information, and requiring employees and third parties to maintain the confidentiality of certain business information.

**The Sales Consultants' Obligations under the Employee Agreements with DePuy Synthes**

50.    In consideration of his employment with DePuy Synthes, Leary executed the Agreement on November 14, 2014, a true and correct copy of which is attached hereto as Exhibit A.

51.     In consideration of his employment with DePuy Synthes, Foley executed the Agreement on November 14, 2014, a true and correct copy of which is attached hereto as Exhibit B.

52.     In consideration of his employment with DePuy Synthes, Valeri executed the Agreement on November 14, 2014, a true and correct copy of which is attached hereto as Exhibit C.

53.     In his Employee Agreement, Leary agreed to a non-competition obligation such that, during his employment with DePuy Synthes and for a period of eighteen (18) months after his last day of employment with DePuy Synthes, he would not:

> directly or indirectly, perform, or assist others to perform, work in [his] TERRITORY for any COMPETITOR in any position and in any location in which [he] could disadvantage [DePuy Synthes] or advantage the COMPETITOR by: (a) [his] disclosure or use of CONFIDENTIAL INFORMATION to which [he] had access; (b) [his] use of specialized training provided to [him] by [DePuy Synthes] or any COMPANY for which [he] have worked; and/or (c) [his] use of CUSTOMER relationships and goodwill.

*See* Ex. A at ¶ C(6).

54.     Consistent with its application to direct *and* indirect competition, the scope of Leary's non-competition restriction encompasses not only the geographic territory to which he was assigned and in which he worked collaboratively as a team but also his work for a competitor such as Globus in any other position or in any other location (*i.e.*, including locations outside of his former territory and positions purportedly covering customer accounts outside of his former territory) in which he nevertheless could disadvantage DePuy Synthes through the use or disclosure of confidential information, the use of his specialized training, and/or his use of DePuy Synthes' Customer relationships and goodwill. *See* Ex. A at ¶ C(6).

55.    For purposes of Leary's non-competition obligation, his Employee Agreement defines "TERRITORY" as "any geographic area: (a) to which the employee or the employee's sales team(s), if any, were assigned or had responsibility; (b) where the employee solicited sales from, made sales to, or provided services to CUSTOMERS; or (c) the geographic area where sales were made on which the employee earned commissions or other compensation, during the last eighteen (18) months of employment"; "COMPETITOR" as "any person or entity including, but not limited to, [him] or anyone acting on [his] behalf, (a) that is engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) [his] use of the specialized training provided to [him] by [DePuy Synthes] or any COMPANY; and/or (c) that could benefit from [his] use of the COMPANY's customer relationships and/or goodwill"; "CONFIDENTIAL INFORMATION" as "information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to [him] or known by [him] as a result of [his] employment by the COMPANY....[which] includes, but is not limited to, (a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales

19

representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to [him] or known by [him] in connection with [his] employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings"; and "CUSTOMER" as "any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which [he] contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of [his] employment with any COMPANY." *See* Ex. A at ¶ B.

56.    In their Employee Agreements, Foley and Valeri agreed to non-competition obligations such that, during their employment with DePuy Synthes and for a period of eighteen (18) months after the last day of their employment with DePuy Synthes, they would not:

> directly or indirectly, perform, or assist others to perform, work for any COMPETITOR *in any position and in any location* in which [they] could disadvantage [DePuy Synthes] or advantage the COMPETITOR by: (a) [their] disclosure or use of CONFIDENTIAL INFORMATION to which [they] had access; (b) [their] use of specialized training provided to [them] by [DePuy Synthes] or any COMPANY for which [they] have worked; and/or (c) [their] use of CUSTOMER relationships and goodwill.

*See* Ex. B at ¶ C(6) (emphasis added); Ex. C at ¶ C(6) (emphasis added).

57. Consistent with their application to direct *and* indirect competition, the scope of Foley's and Valeri's non-competition restrictions thus encompasses not only the geographic territories to which they were assigned and in which they worked collaboratively as a team but also their work for a competitor such as Globus in any other position or in any other location (*i.e.*, including locations outside of their former territories and positions purportedly managing customer accounts outside of their former territories) in which they could disadvantage DePuy Synthes through the use or disclosure of confidential information, the use of their specialized training, and/or their use of DePuy Synthes' Customer relationships and goodwill. *See* Ex. B at ¶ C(6); Ex. C at ¶ C(6).

58. For purposes of Foley's and Valeri's non-competition obligations, their Employee Agreements define "COMPETITOR" as "any person or entity including, but not limited to, [each of them] or anyone acting on [each of their] behalf, (a) that is engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) [their] use of the specialized training provided to [them] by [DePuy Synthes] or any COMPANY; and/or (c) that could benefit from [their] use of the COMPANY's customer relationships and/or goodwill"; "CONFIDENTIAL INFORMATION" as "information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to [them] or known by [them] as a result of [their] employment by the COMPANY....[which] includes, but is not limited to, (a) such things

21

as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to [them] or known by [them] in connection with [their] employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings"; and "CUSTOMER" as "any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which [they] contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of [their] employment with any COMPANY." *See* Ex. B at ¶ B; Ex. C at ¶ B.

59.    The Employee Agreements also each contain provisions prohibiting contact with and solicitation or servicing of DePuy Synthes customers during their employment with DePuy

Synthes and for a period of eighteen (18) months after the last day of their employment with

DePuy Synthes, wherein they agreed that they:

> shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service, or use of any product or service that resembles or competes with or that may be submitted for one that is being sold, under development or acquired by any COMPANY; (b) if [they] are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if [their] activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a competitor.

*See* Exs. A-C at ¶ C(7); *see also* Exs. A-C at ¶ B (defining "CUSTOMER" and

"COMPETITOR," *supra*).

60. The Employee Agreements also each restrict any disloyal, competitive, and

potentially harmful activity or interference with DePuy Synthes' customer or employee

relationships during the Sales Consultants' employment with DePuy Synthes, specifically

defining the scope of their fiduciary obligations to DePuy Synthes:

> During your employment, while you may investigate other employment or business opportunities, you acknowledge and agree that you are subject to a duty of loyalty. Therefore, you agree that during your employment, you will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair your EMPLOYER's business or relationships with its CUSTOMERS; inform CUSTOMERS that you are terminating your employment and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of your EMPLOYER or any COMPANY to join a COMPETITOR.

*See* Ex. A at ¶ C(21); Exs. B & C at ¶ C(18); *see also* Exs. A-C at ¶ B (defining

"CUSTOMER(S)" and "COMPETITOR," *supra*).

61. Buttressing the Sales Consultants' fiduciary duties to DePuy Synthes and DePuy

Synthes' ability to transition the servicing of accounts and patient care and to monitor and ensure

compliance with contractual obligations under the Employee Agreements, the Employee

Agreements require a two-week notice and transition period to which the Sales Consultants

agreed:

> For purposes of enabling [DePuy Synthes] and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify [DePuy Synthes] in writing, at least two weeks before your last date of employment with [DePuy Synthes], and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover ). During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities. You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of [DePuy Synthes] and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if applicable) any new responsibilities. You will promptly provide any additional information requested by [DePuy Synthes] to determine compliance with your obligations under this Agreement. The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

*See* Ex. A at ¶ C(10); Exs. B & C at ¶ C(9).

62.     The Sales Consultants each agreed that DePuy Synthes has "a legitimate interest

in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill

associated with such customer relationships, and the provision of specialized training." *See* Ex.

A at ¶ C(13); Exs. B & C at ¶ C(12).  They also each agreed that the restrictive covenants in the

Agreements "are reasonably necessary to ensure [that DePuy Synthes is] able to protect its

legitimate interests" and that they would not dispute their reasonableness". *See id.*

63.     The Sales Consultants also each recognized that their obligations under the

Employee Agreement "appl[y] to any position that [they] may hold as an employee of the

24

COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the circumstances of [their] employment, including without limitation any change in the scope or nature of [their] responsibilities or assignment, [their] level or seniority, or [their] compensation or benefits." *See* Ex. A at ¶ C(18); Exs. B & C at ¶ C(15).

64.     The Sales Consultants further agreed that if they were to breach any provision of the Agreement, "the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that [they] cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach."  *See* Ex. A at ¶ C(14); Exs. B & C at ¶ C(13).

65.     The Employee Agreements are governed by New Jersey law, consistent with DePuy Synthes' need to protect its legitimate business interests and its nationwide operations with a uniform, national standard.  *See* Exs. A, C at ¶ C(19); Ex. B at ¶ C(22).

### The Sales Consultants' Pre-Resignation Competition and Conspiracy, Coordinated Resignations, and Immediate Employment with Globus

66.     Upon information and belief, the Sales Consultants initially planned to join Globus beginning in or around February 2016.  But they remained employed by DePuy Synthes throughout 2016, delaying their resignations until February 2, 2017, when they collectively notified DePuy Synthes of their resignations.

67.     Despite initially suggesting that they intended to comply with their two-week notice and transition obligations to DePuy Synthes, the Sales Consultants soon thereafter informed DePuy Synthes that at least one of them had been "advised heavily against" remaining with DePuy Synthes for transition and to instead terminate their relationship with DePuy Synthes

and begin working for Globus immediately. As a result, the Sales Consultants' last working day at DePuy Synthes was February 3, 2017.

68.     Upon information and belief, after initially planning to join Globus in or around February 2016, the Sales Consultants met together as a team in April 2016 to assess the business and competitive threats in their assigned territories and to plan jointly the business strategies and goals for the remainder moving forward.

69.     From the time they first planned to join Globus in or around February 2016 until their resignations on February 2, 2017, the Sales Consultants maintained access to DePuy Synthes' resources, confidential information, Customer relationships, and associated good will as well as continued access to their compensation.

70.     Upon information and belief, Globus was aware of the Sales Consultants' contractual notice and transition obligations before and after they commenced employment with Globus and inhibited the Sales Consultants' compliance with those obligations.

71.     Upon information and belief, the Sales Consultants began their employment with Globus on February 6, 2017. On that day, several surgical cases that had previously been scheduled for the use of DePuy Synthes' spine products were converted to Globus. The conversion of those surgical cases from DePuy Synthes to Globus required planning in advance, including, but not limited to, the delivery and preparation of surgical trays and sets containing Globus products for use in the surgery and staffing by Globus employees to cover the surgery. Upon information and belief, that planning and activity occurred before February 6, 2017.

72.     Having abruptly reneged on the Sales Consultants' commitment to aid in the transition in accordance with their obligations, the Defendants left DePuy Synthes without effective cover and transition for the accounts in the Sales Consultants' territories, without

26

effective transition for patient care with respect to scheduled surgical cases, and without the benefit of the two-week period with which to coordinate the Sales Consultants' transition to a new employer to ensure compliance with the obligations in the Employee Agreements. In addition to potentially adverse impacts on patient care, the Defendants' refusal to abide by the Sales Consultants' two-week notice and transition obligations has obstructed the transition of case coverage at DePuy Synthes and inhibited DePuy Synthes from learning the Sales Consultants' roles and responsibilities for Globus in order to ensure compliance with each of their contractual obligations *before* the commencement of their employment with Globus.

73.     In response to DePuy Synthes' initial demands, the Defendants committed to hold off on the Sales Consultants' interactions with customers in the field for a two-week period. That period was designed to allow DePuy Synthes to address the two-week notice and transition period mandated by the Agreements and to obtain critical details regarding the Sales Consultants' anticipated roles and responsibilities for Globus. But the Defendants failed to provide that clarity and have remained committed to assignments for the Sales Consultants that violate the Agreements. Consequently, the Sales Consultants took up where they had left off, recommencing employment in their new sales roles with Globus on or about February 20, 2017.

74.     Globus knew from its history of litigation with DePuy Synthes that DePuy Synthes maintains and enforces agreements with its sales employees containing restrictive covenants.

75.     The responsible decision-makers at Globus, and the Sales Consultants themselves, were well aware of the contractual obligations that the Sales Consultants each owed to DePuy Synthes.

27

76.     However, upon information and belief, Globus recognized an opportunity to poach a significant portion of DePuy Synthes' New Jersey spine sales force in order to convert DePuy Synthes' business, Customer relationships, and goodwill to Globus and to exploit the Sales Consultants' training and access to DePuy Synthes' confidential information.

77.     Globus is now benefitting from the Sales Consultants' violations of their Agreements, and Globus will continue to be unjustly enriched, along with the Sales Consultants, absent restraint by this Court.

78.     Upon information and belief, the Sales Consultants are employed by Globus within the geographic territory covered by their former DePuy Synthes team in violation of the Agreements. They are also in violation of the non-competition restrictions in the Agreements because they are employed by Globus in positions and in locations in which they can directly and indirectly harm DePuy Synthes' by the use or disclosure of DePuy Synthes' Confidential Information, the use of their specialized training, and the use of DePuy Synthes' Customer relationships and goodwill.

79.     Upon information and belief, the Defendants also intend to directly and indirectly solicit and service Customers from the Sales Consultants' assigned DePuy Synthes territories and with whom that had contact or for whom they had responsibility during the last eighteen (18) months of their employment with DePuy Synthes, including by working through each other and with third parties to do that which the Employee Agreements prohibit each of them from doing directly.

80.     Upon information and belief, the conversion of cases on the very first day of their employment confirm not only the Defendants' intent to flout and interfere with the Sales Consultants' non-competition and non-solicitation obligations going forward but also that the

unlawful competitive activities undertaken before the Sales Consultants' resignations on February 2, 2017 have already borne fruit.

81.    Upon information and belief, the Sales Consultants—working with the assistance and support of Globus and/or through Globus and Globus's employees—began soliciting DePuy Synthes Customers on behalf of Globus and to facilitate their transition to Globus prior to their resignation from DePuy Synthes on February 2, 2017.

82.    Upon information and belief, as a result of these pre-resignation activities, the Defendants have already successfully solicited DePuy Synthes Customers in violation of their contractual and common law obligations to DePuy Synthes.  The Defendants will continue to benefit from those unlawful solicitations and will continue to inflict substantial, and irreparable, harm on DePuy Synthes, including through ongoing violations of the Agreements, unless restrained.

## COUNT I
## BREACH OF FIDUCIARY DUTY AND/OR DUTY OF LOYALTY
### (Against Foley, Leary, and Valeri)

83.    DePuy Synthes incorporates and re-alleges the allegations set forth above, which further detail the Sales Consultants' unlawful and disloyal conduct as though fully set forth herein.

84.    During the term of their employment with DePuy Synthes, the Sales Consultants each owed DePuy Synthes a duty of the utmost good faith, undivided loyalty, diligence, and faithful service and a duty to place DePuy Synthes' interests ahead of their own and not to act for persons, entities, or purposes whose interests would conflict with those of DePuy Synthes.

85.    Disregarding those duties and while being compensated by DePuy Synthes, the Sales Consultants diverted their efforts during their time as DePuy Synthes employees towards

29

the solicitation of DePuy Synthes Customers on behalf of Globus in order to facilitate their ongoing competition with DePuy Synthes after their resignation.

86.     Upon and information and belief, the Sales Consultants breached their fiduciary duty by exploiting and misusing DePuy Synthes' time, resources, information, products, and systems in order to benefit Globus and themselves during the course of their employment with DePuy Synthes.

87.     Upon information and belief, the Sales Consultants informed DePuy Synthes Customers prior to their resignation that they would be leaving the employ of DePuy Synthes and discussed, implicitly or explicitly, Globus' competing products and the potential use of Globus's competing products by the Customers.

88.     Upon information and belief, the Sales Consultants' pre-resignation conduct in violation of their fiduciary duties to DePuy Synthes caused several surgical cases previously scheduled for the use of DePuy Synthes' spine products to convert to Globus on and after February 6, 2017.

89.     Upon information and belief, the Sales Consultants breached their fiduciary duties to DePuy Synthes by exploiting their access to DePuy Synthes' computers and systems during the period of time they were coordinating their departures, soliciting Customers on behalf of Globus, and competing with DePuy Synthes prior to their resignations.

90.     Upon information and belief, the Sales Consultants breached their fiduciary duties by usurping Customer relationships belonging to DePuy Synthes to benefit Globus and themselves.

91.     Upon information and belief, the Sales Consultants breached their fiduciary duties by soliciting each other to resign from DePuy Synthes to join Globus, where they would

participate in an unlawful scheme to solicit DePuy Synthes Customers and convert business from DePuy Synthes to Globus.

92.     The Sales Consultants were bound to act in good faith and with due regard to the interests of DePuy Synthes while employees of DePuy Synthes, but instead acted for their own interests and to injure DePuy Synthes in its business, and they have been unjustly enriched through their unlawful conduct.

93.     DePuy Synthes has suffered, and will continue to suffer, substantial and irreparable harm as a result of the Sales Consultants' tortious conduct.

94.     The Sales Consultants' tortious conduct is a direct and proximate cause of DePuy Synthes' damages.

WHEREFORE, DePuy Synthes demands judgment in its favor and against the Defendants, and respectfully requests the following relief:

a.     Actual damages that DePuy Synthes is entitled to recover as a result of the Sales Consultants' breaches of fiduciary duty;

b.     Incidental and consequential damages as permitted by law;

c.     The establishment of a constructive trust in favor of DePuy Synthes;

d.     Damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Sales Consultants' tortious conduct;

e.     Recoupment of compensation paid to the Sales Consultants during the breach of their fiduciary duties to DePuy Synthes;

f.     Injunctive relief;

g.     An equitable accounting, disgorgement, forfeiture, and delivery to DePuy Synthes of all assets, income, profits, pecuniary benefits, and all illicitly

obtained gains or profits resulting from the Sales Consultants' tortious

conduct or from their possession or use of DePuy Synthes' resources;

h.      An equitable accounting, forfeiture, forensic analysis, and return of all

DePuy Synthes' information, property, and product in the Defendants'

possession, custody, or control;

i.      DePuy Synthes' attorney's fees and costs;

j.      Interest; and

k.      All such other relief as this Court deems appropriate.

**COUNT II**
**BREACH OF CONTRACT**
**(Against Foley, Leary, and Valeri)**

95.      DePuy Synthes incorporates and re-alleges every allegation set forth above, which

further detail the Defendants' conduct as though fully set forth herein.

96.      The Employee Agreements between the Sales Consultants and DePuy Synthes are

valid and enforceable agreements and are each supported by adequate consideration.

97.      The Employee Agreements prohibit the Sales Consultants from, among other

things set forth above and in the Employee Agreements, directly and/or indirectly soliciting

DePuy Synthes' Customers; disclosing or using DePuy Synthes' confidential, proprietary, and

trade secret information; or otherwise competing with DePuy Synthes in their DePuy Synthes

Territories. *See* Exs. A-C, ¶ C(6-8).

98.      The Sales Consultants have breached, and threaten to continue to breach, their

Agreements as a result of their new employment with Globus, DePuy Synthes' direct competitor

and a "COMPETITOR" as defined in the Employee Agreements.

99.     Despite initially assuring DePuy Synthes that they would honor DePuy Synthes' two-week notice and transition policy and the obligations in their Employee Agreement, the Sales Consultants reneged on their assurances and left the employment of DePuy Synthes just one day after tendering their resignations.

100.     The Sales Consultants' failure to provide DePuy Synthes with two-weeks' notice of their resignation prevented DePuy Synthes from effectively transitioning and covering the accounts for which the Sales Consultants were responsible in violation of their obligations of good faith and fair dealing.

101.     Upon information and belief, the Sales Consultants acted in a coordinated fashion to resign collectively from DePuy Synthes and join Globus, where they have solicited, and plan to continue to solicit, DePuy Synthes' Customers in violation of the Employee Agreements.

102.     Upon information and belief, the Sales Consultants informed DePuy Synthes' Customers of their intent to join Globus prior to their resignations, solicited DePuy Synthes' Customers prior to their resignations regarding Globus and Globus' competing products, and discussed explicitly and/or implicitly the Customers' use, potential use, or review of Globus's competing products.

103.     Upon information and belief, the Sales Consultants' pre-resignation solicitations of DePuy Synthes Customers caused several surgical cases previously scheduled for DePuy Synthes' spine products to convert to Globus on or after February 6, 2017.

104.     Upon information and belief, the Defendants intend to, and have already begun to, directly and indirectly solicit and service Customers from their assigned DePuy Synthes territories and with whom that had contact or for whom they had responsibility during the last eighteen (18) months of their employment with DePuy Synthes, including by working through

each other and with third parties to do that which the Employee Agreements prohibit each of them from doing directly.

105.    Upon information and belief, the Sales Consultants are employed by Globus within the geographic territory covered by their former DePuy Synthes team in violation of the Agreements.  They are also in violation of the non-competition restrictions in the Agreements because they are employed by Globus in positions and in locations in which they can directly and indirectly harm DePuy Synthes' by the use or disclosure of DePuy Synthes' Confidential Information, the use of their specialized training, and the use of DePuy Synthes' Customer relationships and goodwill.

106.    Upon information and belief, the Sales Consultants have used and/or inevitably will use or continue to use DePuy Synthes' confidential information in the course of their unlawful competition with DePuy Synthes in violation of the Employee Agreements.

107.    Upon information and belief, the Sales Consultants have disclosed and/or inevitably will disclose DePuy Synthes' confidential information in the course of their unlawful competition with DePuy Synthes in violation of the Employee Agreements.

108.    Upon information and belief, the Sales Consultants have used and/or inevitably will use DePuy Synthes' Customer relationships and/or goodwill in the course of their unlawful competition with DePuy Synthes in violation of the Employee Agreements

109.    Consistent with their application to direct *and* indirect competition, the scope of the Sales Consultants' non-competition obligations in the Agreement encompasses not only the geographic territories to which they were assigned and in which they worked collaboratively as a team but also their work for a competitor such as Globus in any other position or in any other location (*i.e.*, including locations outside of their former territories and positions purportedly

34

managing or covering customer accounts outside of their former territories) in which they could disadvantage DePuy Synthes through the use or disclosure of confidential information, the use of their specialized training, and/or their use of DePuy Synthes' Customer relationships and goodwill. *See* Exs. A-C at ¶ C(6).

110. The Sales Consultants' actual and/or prospective breaches of the Employee Agreements have caused, and will continue to cause, immediate and irreparable harm to DePuy Synthes.

111. DePuy Synthes has no adequate remedy at law to fully compensate them for the harm caused by the Sales Consultants' unlawful conduct and will continue to suffer substantial and immediate irreparable harm unless they are restrained.

WHEREFORE, DePuy Synthes demands judgment in its favor and against the Defendants, and respectfully requests the following relief:

      a.    Enforcement of the Employee Agreements;

      b.    Interim and permanent injunctive relief prohibiting the Sales Consultants from violating the terms of their Agreements;

      c.    Actual damages that DePuy Synthes is entitled to recover as a result of the Sales Consultants' breaches of the Employee Agreements;

      d.    Incidental and consequential damages as permitted by law;

      e.    The establishment of a constructive trust in favor of DePuy Synthes;

      f.    Damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Sales Consultants' breaches of the Employee Agreements;

g.    An equitable accounting, disgorgement, forfeiture, and delivery to DePuy
      Synthes of all assets, income, profits, pecuniary benefits, and all illicitly
      obtained gains or profits resulting from the Sales Consultants' breaches of
      the Employee Agreements or from their possession or use of DePuy
      Synthes' resources;

h.    An equitable accounting, forfeiture, forensic analysis, and return of all
      DePuy Synthes' information, property, and product in the Defendants'
      possession, custody, or control;

i.    DePuy Synthes' attorney's fees and costs;

j.    Interest; and

k.    All such other relief as this Court deems appropriate.

## <u>COUNT III</u>
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## <u>(Against the Defendants)</u>

112.    DePuy Synthes incorporates and re-alleges every allegations set forth above,
which further detail Defendants' conduct, as though fully set forth herein.

113.    In addition, or in the alternative, this count states a claim for aiding and abetting
breach of fiduciary duties under Restatement (Second) of Torts, § 876(b), as adopted under New
Jersey law.

114.    The Sales Consultants breached their fiduciary duties to DePuy Synthes as set
forth more fully above and incorporated herein all in violation of New Jersey common law.

115.    The Defendants each knew or should have known of the fiduciary duties each of
the Sales Consultants owed to DePuy Synthes and the breaches of those fiduciary duties.

36

116.     The Defendants each offered substantial assistance and encouragement in furtherance of the breaches of fiduciary duties owed by each of the Sales Consultants to DePuy Synthes.

117.     The Defendants' conduct is the direct and proximate cause of DePuy Synthes' harm and damages.

WHEREFORE, DePuy Synthes demands judgment in its favor and against Defendants, and respectfully requests the following relief:

a.     Actual damages that DePuy Synthes is entitled to recover as a result of the Defendants' aiding and abetting of the breaches of fiduciary duties owed by the Sales Consultants to DePuy Synthes;

b.     Incidental and consequential damages as permitted by law;

c.     For punitive damages to punish the Defendants for their willful and malicious conduct in aiding and abetting the breaches of fiduciary duties owed by the Sales Consultants to DePuy Synthes;

d.     The establishment of a constructive trust in favor of DePuy Synthes;

e.     Damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Defendants' tortious conduct;

f.     An equitable accounting, disgorgement, forfeiture, and delivery to DePuy Synthes of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the Defendants' tortious conduct;

g.     An equitable accounting, forfeiture, forensic analysis, and return of all DePuy Synthes' information, property, and product in the Defendants' possession, custody, or control;

37

h.    Injunctive relief;

i.    DePuy Synthes' attorney's fees and costs;

j.    Interest; and

k.    All such other relief as this Court deems appropriate.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS AND
PROSPECTIVE BUSINESS RELATIONS**
**(Against the Defendants)**

118.    DePuy Synthes incorporates and re-alleges every allegation set forth above, which further detail the Defendants' conduct, as though fully set forth herein.

119.    In addition, or in the alternative, the Defendants have tortiously interfered with DePuy Synthes' contractual relationships with each of the Sales Consultants.

120.    At the time that the Sales Consultants were working together and with Globus on the Sales Consultants' coordinated resignation and pre-resignation solicitation of DePuy Synthes' Customers, and before then, DePuy Synthes had existing contractual relationships with the Sales Consultants (*see* Exs. A-C), and each of the Defendants knew or should have known about those contractual relationships.

121.    At the time the Sales Consultants began working for Globus, DePuy Synthes had contractual relationships with the Sales Consultants (*see* Exs. A-C), and the Defendants each knew about those contractual relationships.

122.    The Defendants have tortiously interfered with DePuy Synthes' contractual relationships with each of the Sales Consultants by encouraging and causing the Sales Consultants to breach their contractual obligations to DePuy Synthes.

123.    DePuy Synthes has and has had valuable relationships with Customers in the New Jersey territories and those with whom the Sales Consultants interacted during their employment

38

with DePuy Synthes, and the Defendants each knew or should have known about those relationships and about the prospects of future relationships, including additional cases and sales, when they tortiously interfered with DePuy Synthes' Customer relationships on behalf of and for the benefit of Globus and to the detriment of DePuy Synthes. Indeed, upon information and belief, the prospective business from DePuy Synthes' customers was a material factor in Globus' identification and recruitment of the Sales Consultants, the Sales Consultants' decision to join Globus and to solicit DePuy Synthes' Customers, and in the Defendants' conversion of surgical cases from DePuy Synthes to Globus beginning on or before February 6, 2017.

124.    Throughout all of their tortious conduct, the Defendants have acted without privilege or justification in interfering with DePuy Synthes' relationships with each of the Sales Consultants and with DePuy Synthes' Customers.

125.    The Defendants' interference with DePuy Synthes' relationships with each of the Sales Consultants and with DePuy Synthes' Customers was willful and wanton and has been carried out with a specific intent to injure DePuy Synthes in the conduct of its business.

126.    DePuy Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of the Defendants' tortious conduct.

WHEREFORE, DePuy Synthes demands judgment in its favor and against Defendants, and respectfully requests the following relief:

      a.    Actual damages that DePuy Synthes is entitled to recover as a result of the Defendants' tortious interference;

      b.    Incidental and consequential damages as permitted by law;

    c.      For punitive damages to punish the Defendants for their willful and malicious conduct in tortiously interfering with DePuy Synthes' contractual and prospective business relationships;

    d.      The establishment of a constructive trust in favor of DePuy Synthes;

    e.      Damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Defendants' tortious conduct;

    f.      An equitable accounting, disgorgement, forfeiture, and delivery to DePuy Synthes of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the Defendants' tortious conduct;

    g.      An equitable accounting, forfeiture, forensic analysis, and return of all DePuy Synthes' information, property, and product in the Defendants' possession, custody, or control;

    h.      Injunctive relief;

    i.      DePuy Synthes' attorney's fees and costs;

    j.      Interest; and

    k.      All such other relief as this Court deems appropriate.

**COUNT V**
**UNFAIR COMPETITION**
**(Against all Defendants)**

127.    DePuy Synthes incorporates and re-alleges every allegation set forth above, which further detail the Defendants' conduct, as though fully set forth herein.

128.    In addition, or in the alternative, the Defendants have engaged in unfair competition with DePuy Synthes.

129.     Unfairly competing with DePuy Synthes, the Defendants have engaged in a conspiracy to unlawfully divert, and have succeeded in unlawfully diverting, business away from DePuy Synthes for the benefit of Globus using DePuy Synthes' Customer relationships, good will, and confidential information and by, among other things set forth above and incorporated herein, breaching, aiding or encouraging breaches of, and tortiously interfering with the Sales Consultants' fiduciary and contractual obligations to DePuy Synthes, in order to compete unfairly with DePuy Synthes in the highly competitive medical device industry and secure, and continue to benefit from, an unfair competitive advantage not available to legitimate, lawful competitors in the industry.

130.     The Defendants' unlawful acts are the direct and proximate cause of DePuy Synthes' harm and damages.

131.     Should the Defendants' unfair competition continue unabated, DePuy Synthes will continue to suffer irreparable harm.

WHEREFORE, DePuy Synthes demands judgment in its favor and against the Defendants, and respectfully requests the following relief:

a.     Actual damages that DePuy Synthes is entitled to recover as a result of the Defendants' unfair competition with DePuy Synthes;

b.     Incidental and consequential damages as permitted by law;

c.     Punitive damages to punish the Defendants for their willful and malicious conduct of unfairly competing with DePuy Synthes';

d.     The establishment of a constructive trust in favor of DePuy Synthes;

e.     Damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Defendants' unfair competition;

41

f.      An equitable accounting, disgorgement, forfeiture, and delivery to DePuy

Synthes of all assets, income, profits, pecuniary benefits, and all illicitly

obtained gains or profits resulting from the Defendants' unfair

competition;

g.      An equitable accounting, forfeiture, forensic analysis, and return of all

DePuy Synthes' information, property, and product in the Defendants'

possession, custody, or control;

h.      Injunctive relief;

i.      DePuy Synthes' attorney's fees and costs;

j.      Interest; and

k.      All such other relief as this Court deems appropriate.

**COUNT VI**
**CONSPIRACY**
**(Against the Defendants)**

1.      DePuy Synthes incorporates and re-alleges every allegation set forth above, which

further detail the Defendants' conduct, as though fully set forth herein.

2.      In addition, or in the alternative, the Sales Consultants, in combination with each

other and Globus, conspired to unlawfully divert, and have succeeded in unlawfully diverting,

business away from DePuy Synthes for the benefit of Globus using DePuy Synthes' Customer

relationships, good will, and confidential information and by, among other things set forth above

and incorporated herein, breaching, aiding or encouraging breaches of, tortiously interfering with

the Sales Consultants' fiduciary and contractual obligations to DePuy Synthes, and/or engaging

in unfair competition.

3.      The Defendants' coordinated unlawful acts are the direct and proximate cause of DePuy Synthes' harm and damages.

4.      Should the Defendants' conspiracy continue unabated, DePuy Synthes will continue to suffer irreparable harm.

WHEREFORE, DePuy Synthes demands judgment in its favor and against the Defendants, and respectfully requests the following relief:

a.      Actual damages that DePuy Synthes is entitled to recover as a result of the Defendants' conspiracy;

b.      Incidental and consequential damages as permitted by law;

c.      For punitive damages to punish the Defendants for their willful and malicious conduct in tortiously interfering with DePuy Synthes' contractual relationships;

d.      The establishment of a constructive trust in favor of DePuy Synthes;

e.      Damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Defendants' tortious conduct;

f.      An equitable accounting, disgorgement, forfeiture, and delivery to DePuy Synthes of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the Defendants' tortious conduct;

g.      An equitable accounting, forfeiture, forensic analysis, and return of all DePuy Synthes' information, property, and product in the Defendants' possession, custody, or control;

h.      Injunctive relief;

i.      DePuy Synthes' attorney's fees and costs;

43

j.   Interest; and

k.   All such other relief as this Court deems appropriate.

Respectfully submitted,

Dated:  March 9, 2017

**BLANK ROME LLP**

_Anney B Itzller_

Anthony B. Haller (Pa. I.D. No. 37017)
Leigh Ann Buziak (Pa. I.D. No. 93949)
Kevin M. Passerini (Pa. I.D. No. 203169)
Rosemary McKenna (Pa. I.D. No. 307796)
One Logan Square
Philadelphia, PA 19103
(t) +1.215.569.5690 / 5386 / 5466 / 5369
(f) +1.215.832.5690 / 5386 / 5466 / 5369
haller@blankrome.com
lbuziak@blankrome.com
passerini@blankrome.com
mckenna@blankrome.com

*Attorneys for Plaintiff DePuy Synthes Sales,
Inc.*

44

## VERIFICATION

I, Michael Landau, in my capacity as VP Sales, Northeast Area in DePuy Synthes' Spine division, hereby state that I am familiar with the facts set forth in the foregoing Verified Complaint, am authorized to execute this Verification on behalf of Plaintiff DePuy Synthes Sales, Inc., and that the facts set forth therein are true and correct to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 for unsworn falsification to authorities.

_____
Michael Landau

Dated: March 9, 2017

# EXHIBIT A

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee: Jeremy Leary

TO BE PROVIDED BY H.R.

Employee WWID: 417739

### A.  Introduction

**DePuy Synthes Sales, Inc.** is one of numerous entities within the Johnson & Johnson Family of Companies.  The businesses in which these entities are engaged are extremely competitive.  During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below), will develop, maintain or enhance business and/or customer relationships and receive training relating to the business of **DePuy Synthes Sales, Inc.** and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies.  This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other entity within the Johnson & Johnson Family of Companies.

This Agreement sets forth your obligations during and after your employment with the COMPANY including, but not limited to, defining certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-competition, non-solicitation of employees and publicity.

### B.  Definitions

As used in this Agreement:

**COMPANY** means individually and/or collectively **DePuy Synthes Sales, Inc.,** Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns.  An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly.

**EMPLOYER** means **DePuy Synthes Sales, Inc.** or, if applicable, any other COMPANY by which you are (or were) employed at any time.  For purposes of this Agreement, after you are no longer employed by any COMPANY, EMPLOYER means any COMPANY by which you were last employed.

**INVENTIONS** means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered, that relate to any work assigned to or performed by you for or on behalf of your EMPLOYER or any COMPANY or to the actual or anticipated research or development or other business activities of your EMPLOYER or any  COMPANY.

**CONFIDENTIAL INFORMATION** means information or a compilation of information, in any form (tangible or intangible)  about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by the  COMPANY.  CONFIDENTIAL INFORMATION includes, but is not limited to, (a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering,

1

marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to you or known by you in connection with your employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

**COMPETITOR** means any person or entity including, but not limited to, you or anyone acting on your behalf, (a) that is engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for,  a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development;  (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) your use of the specialized training provided to you by your EMPLOYER or any COMPANY; and/or (c) that could benefit from your use of the COMPANY's customer relationships and/or goodwill.

**TERRITORY** for purposes of Paragraph 6 means any geographic area: (a) to which the employee or the employee's sales team(s), if any, were assigned or had responsibility; (b) where the employee solicited sales from, made sales to, or provided services to CUSTOMERS; or (c) the geographic area where sales were made on which the employee earned commissions or other compensation,  during the last eighteen (18) months of employment.

**CUSTOMER** means any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of your employment with any COMPANY.

## C.  Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION, training, your employment or the continuation of your employment with your EMPLOYER, your access to customer relationships and good will, and/or for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, you agree, and intend to be legally bound, as follows:

1.  You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, your EMPLOYER or any  COMPANY.  Except as otherwise provided in Paragraphs 25, 26 and 27 of this Agreement, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its

designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2. All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works, that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and maintain a patent, or trademark or copyright registration or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS, or copyrightable works conceived, reduced to practice, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. You acknowledge that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a COMPETITOR, will cause immediate irreparable injury to the COMPANY. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of your EMPLOYER or any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you will not, directly or indirectly, perform, or assist others to perform, work in your TERRITORY for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by: (a) your disclosure or use of CONFIDENTIAL INFORMATION to which you had access; (b) your use of the specialized training provided to you by your EMPLOYER or any COMPANY for which you have worked; and/or (c) your use of CUSTOMER relationships and goodwill. Following the termination of your employment, you will be permitted to work

for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurances satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANY. The restrictions of this Paragraph 6 will not apply with respect to services you render in California after termination of your employment within the COMPANIES that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

7.  You acknowledge that the COMPANY's relationships with CUSTOMERS and the goodwill associated with such relationships are important and valuable business assets that results from the COMPANY's significant investment of its time and resources. Therefore, you agree that during your employment and for eighteen (18) months after the termination of your employment (whether voluntary or involuntary) with the COMPANY, you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if you are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if your activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR. For purposes of this Paragraph 7, COMPANY shall mean your EMPLOYER and any COMPANY that you worked for during the last eighteen months of your employment. The restrictions of this Paragraph 7 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8.  Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANY, you will not, directly or indirectly, on your own behalf or on behalf of others, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment with the COMPANY. The restrictions of this Paragraph 8 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9.  You shall not in any way disparage your EMPLOYER, any COMPANY, or their employees, products or services to any CUSTOMER including, without limitation, taking any action or making any derogatory statement the intent or reasonably foreseeable effect of which is to impugn or injure the reputation or goodwill of your EMPLOYER, any COMPANY, or their employees, products or services.

10. For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, at least two weeks before your last date of employment with your EMPLOYER, and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover ).

During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities. You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if applicable) any new responsibilities. You will promptly provide any additional information requested by your EMPLOYER to determine compliance with your obligations under this Agreement. The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

11. If your employment with your EMPLOYER terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures set forth and referenced in Addendum A, which is incorporated by reference herein. If you voluntarily terminate or resign from your employment with your EMPLOYER, then you shall not be eligible for such payments.

12. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any COMPANY, including any computer or electronic equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk or drive) relating in any way to the business of your EMPLOYER or the COMPANY that were entrusted to, created by or obtained by you at any time during your employment with the COMPANY.

13. You acknowledge that your EMPLOYER and/or the COMPANY have a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision to you of specialized training. You further acknowledge that the restrictive covenants contained in this Agreement are reasonably necessary to ensure your EMPLOYER or the COMPANY is able to protect its legitimate interests and, therefore, you agree not to, in any action, suit or other proceeding, deny the reasonableness of, or assert the unreasonableness of, the restrictive covenants and you hereby waive any such defense. In addition, you agree that the restrictive covenants in this Agreement are separate and independent obligations and, therefore, the failure or alleged failure of the COMPANY to perform any obligations owed to you shall not constitute a defense to the enforceability of such restrictive covenants. Accordingly, you acknowledge that if you violate or are about to violate this Agreement, immediate irreparable injury to your EMPLOYER and the COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against you without the necessity of posting any bond.

14. If you breach any of the provisions of this Agreement, the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that you cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach.

15. You agree to indemnify and pay your EMPLOYER and/or any COMPANY for the reasonable attorneys' fees and costs it incurs (including fees and costs incurred before the initiation of litigation, during litigation, and any trials, appeals and/or any petitions) to enforce the terms of the Agreement in the event you violate any of its terms or in the

event you unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement.

16. If you violate this Agreement or unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement, in addition to injunctive relief, you agree that your EMPLOYER shall be entitled to recover from you as damages any and all costs or expenses incurred by your EMPLOYER for your training including, but not limited to, training related to EMPLOYER's business, products, services, and/or processes during the two year period prior to termination, whether voluntary or involuntary. EMPLOYER shall also be entitled to recover from you all fees and expenses incurred by your EMPLOYER to recruit, hire and/or train your replacement.

17. If you violate this Agreement or unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement, in addition to injunctive relief and to the extent calculable, you agree that your EMPLOYER and/or the COMPANY shall be entitled to recover from you monetary damages, including lost profits, for any period of time during which you violated this Agreement or for any period of time before a Court enjoined you from violating this Agreement. For purposes of determining such damages, you agree that EMPLOYER's lost profits shall mean the greater of (a) EMPLOYER's lost sales or (b) any profits earned by your new employer.

18. You agree that this Agreement applies to any position that you may hold as an employee of the COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the circumstances of your employment, including without limitation any change in the scope or nature of your responsibilities or assignment, your level or seniority, or your compensation or benefits.

19. You agree that your EMPLOYER may assign this Agreement and all of its rights and obligations. Each COMPANY is an express third-party beneficiary of this Agreement.

20. Nothing in this Agreement shall limit or affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

21. During your employment, while you may investigate other employment or business opportunities, you acknowledge and agree that you are subject to a duty of loyalty. Therefore, you agree that during your employment, you will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair your EMPLOYER's business or relationships with its CUSTOMERS; inform CUSTOMERS that you are terminating your employment and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of your EMPLOYER or any COMPANY to join a COMPETITOR.

22. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action that you initiate relating to or arising out of this Agreement must be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both New Jersey State and Federal courts and to service of process by United States mail or express courier service in any such action. Any litigation initiated by you in any other forum or jurisdiction must be transferred to an appropriate court in New Jersey.

23. You irrevocably consent not to sue the COMPANY in any jurisdiction other than the state or federal courts of New Jersey for the purposes of any action arising out of or related to this Agreement. You further agree not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state or federal court in New Jersey.

24. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

25. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

26. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

27. The following applies only to a State of Washington employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

28. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

29. This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them relating to its subject matter. In

the event that this Agreement be declared invalid, void, or unenforceable for any reason, then you understand, agree, and acknowledge any non-compete, confidentiality, non-solicitation, and/or non-disclosure agreement previously entered between you and any COMPANY, which was superseded by this Agreement, shall be reinstated and remain in full force and effect. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of the COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.


DATE: _11/14/14_

_____
EMPLOYEE SIGNATURE

_Jeremy David Leahy_
Print Employee Name  (Please Print)

_5 Pearl St_
Address

_Sayreville  NJ 08872_
City/State

# EXHIBIT B

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee: Michael Foley

TO BE PROVIDED BY H.R.

Employee WWID:

### A.  Introduction

**DePuy Synthes Sales, Inc.** is one of numerous entities within the Johnson & Johnson Family of Companies.  The businesses in which these entities are engaged are extremely competitive.  During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below), will develop, maintain or enhance business and/or customer relationships and receive training relating to the business of **DePuy Synthes Sales, Inc.** and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies.  This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other entity within the Johnson & Johnson Family of Companies.

This Agreement sets forth your obligations during and after your employment with the COMPANY including, but not limited to, defining certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-competition, non-solicitation of employees and publicity.

### B.  Definitions

As used in this Agreement:

**COMPANY** means individually and/or collectively **DePuy Synthes Sales, Inc.,** Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns.  An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly.

**EMPLOYER** means **DePuy Synthes Sales, Inc.** or, if applicable, any other COMPANY by which you are (or were) employed at any time.  For purposes of this Agreement, after you are no longer employed by any COMPANY, EMPLOYER means any COMPANY by which you were last employed.

**INVENTIONS** means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered, that relate to any work assigned to or performed by you for or on behalf of your EMPLOYER or any COMPANY or to the actual or anticipated research or development or other business activities of your EMPLOYER or any  COMPANY.

**CONFIDENTIAL INFORMATION** means information or a compilation of information, in any form (tangible or intangible)  about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by the  COMPANY.  CONFIDENTIAL INFORMATION includes, but is not limited to, (a)  such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering,

1

marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to you or known by you in connection with your employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

**COMPETITOR** means any person or entity including, but not limited to, you or anyone acting on your behalf, (a) that is engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for,  a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development;  (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) your use of the specialized training provided to you by your EMPLOYER or any COMPANY; and/or (c) that could benefit from your use of the COMPANY's customer relationships and/or goodwill.

**CUSTOMER** means any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of your employment with any COMPANY.

## C. Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION, training, your employment or the continuation of your employment with your EMPLOYER, your access to customer relationships and good will, and/or for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, you agree, and intend to be legally bound, as follows:

1.  You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, your EMPLOYER or any  COMPANY.  Except as otherwise provided in Paragraphs 22, 23 and 24 of this Agreement, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2. All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works, that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and maintain a patent, or trademark or copyright registration or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS, or copyrightable works conceived, reduced to practice, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. You acknowledge that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a COMPETITOR, will cause immediate irreparable injury to the COMPANY. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of your EMPLOYER or any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you will not, directly or indirectly, perform, or assist others to perform, work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by: (a) your disclosure or use of CONFIDENTIAL INFORMATION to which you had access; (b) your use of the specialized training provided to you by your EMPLOYER or any COMPANY for which you have worked; and/or (c) your use of CUSTOMER relationships and goodwill. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurances satisfactory to the COMPANY with a competitive interest that you will not

render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANY. The restrictions of this Paragraph 6 will not apply with respect to services you render in California after termination of your employment within the COMPANIES that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

7.  You acknowledge that the COMPANY's relationships with CUSTOMERS and the goodwill associated with such relationships are important and valuable business assets that results from the COMPANY's significant investment of its time and resources. Therefore, you agree that during your employment and for eighteen (18) months after the termination of your employment (whether voluntary or involuntary) with the COMPANY, you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b)  if you are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if your activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR. For purposes of this Paragraph 7, COMPANY shall mean your EMPLOYER and any COMPANY that you worked for during the last eighteen months of your employment. The restrictions of this Paragraph 7 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8.  Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANY, you will not, directly or indirectly, on your own behalf or on behalf of others, solicit, recruit, interview, hire,  identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment with the COMPANY. The restrictions of this Paragraph 8 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9.  For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, at least two weeks before your last date of employment with your EMPLOYER, and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover ). During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities. You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if applicable) any new responsibilities. You will promptly provide any additional information requested by your EMPLOYER to determine compliance with your obligations under this Agreement.  The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those

obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10. If your employment with your EMPLOYER terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures set forth and referenced in Addendum A, which is incorporated by reference herein. If you voluntarily terminate or resign from your employment with your EMPLOYER, then you shall not be eligible for such payments.

11. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any COMPANY, including any computer or electronic equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk or drive) relating in any way to the business of your EMPLOYER or the COMPANY that were entrusted to, created by or obtained by you at any time during your employment with the COMPANY.

12. You acknowledge that your EMPLOYER and/or the COMPANY have a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision to you of specialized training. You further acknowledge that the restrictive covenants contained in this Agreement are reasonably necessary to ensure your EMPLOYER or the COMPANY is able to protect its legitimate interests and, therefore, you agree not to, in any action, suit or other proceeding, deny the reasonableness of, or assert the unreasonableness of, the restrictive covenants and you hereby waive any such defense. In addition, you agree that the restrictive covenants in this Agreement are separate and independent obligations and, therefore, the failure or alleged failure of the COMPANY to perform any obligations owed to you shall not constitute a defense to the enforceability of such restrictive covenants. Accordingly, you acknowledge that if you violate or are about to violate this Agreement, immediate irreparable injury to your EMPLOYER and the COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against you without the necessity of posting any bond.

13. If you breach any of the provisions of this Agreement, the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that you cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach.

14. You agree to indemnify and pay your EMPLOYER and/or any COMPANY for the reasonable attorneys' fees and costs it incurs (including fees and costs incurred before the initiation of litigation, during litigation, and any trials, appeals and/or any petitions) to enforce the terms of the Agreement in the event you violate any of its terms or in the event you unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement.

15. You agree that this Agreement applies to any position that you may hold as an employee of the COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the circumstances of your employment, including without limitation any change in the scope or nature of your responsibilities or assignment, your level or seniority, or your compensation or benefits.

16. You agree that your EMPLOYER may assign this Agreement and all of its rights and obligations. Each COMPANY is an express third-party beneficiary of this Agreement.

17. Nothing in this Agreement shall limit or affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

18. During your employment, while you may investigate other employment or business opportunities, you acknowledge and agree that you are subject to a duty of loyalty. Therefore, you agree that during your employment, you will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair your EMPLOYER's business or relationships with its CUSTOMERS; inform CUSTOMERS that you are terminating your employment and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of your EMPLOYER or any COMPANY to join a COMPETITOR.

19. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action that you initiate relating to or arising out of this Agreement must be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both New Jersey State and Federal courts and to service of process by United States mail or express courier service in any such action. Any litigation initiated by you in any other forum or jurisdiction must be transferred to an appropriate court in New Jersey.

20. You irrevocably consent not to sue the COMPANY in any jurisdiction other than the state or federal courts of New Jersey for the purposes of any action arising out of or related to this Agreement. You further agree not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state or federal court in New Jersey.

21. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

22. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

23. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the

INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

24. <u>The following applies only to a State of Washington employee</u>: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

25. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

26. This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them relating to its subject matter. In the event that this Agreement be declared invalid, void, or unenforceable for any reason, then you understand, agree, and acknowledge any non-compete, confidentiality, non-solicitation, and/or non-disclosure agreement previously entered between you and any COMPANY, which was superseded by this Agreement, shall be reinstated and remain in full force and effect. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of the COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

DATE: 11/14/2014

EMPLOYEE SIGNATURE

Michael Foley

Print Employee Name  (Please Print)

148 Havens Mill Rd

Address

Freehold, NJ

City/State

## ADDENDUM A

A.  If, after at least a month following the termination of your employment within the COMPANY, for reasons other than misconduct or your voluntary resignation, and after a diligent search for employment that complies with the terms of the Agreement and this Addendum, you are unable to obtain employment in a position in which your annual base salary is at least equal to your annual base salary at the time of such termination solely because of the restrictions set forth in Paragraph 6 or 7 of this Agreement, then, commencing after submission of an application for payment and any additional requested information and documents and a determination by your EMPLOYER in due course that you qualify for payment, your EMPLOYER shall make monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as annual base salary or (b) the difference between your last annual base salary at your EMPLOYER and your annual base salary in any subsequent position for each month for which you properly apply for payment and your EMPLOYER determines your entitlement.   Your annual base salary for or with any subsequent employer will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.   No payment shall be made in advance of the month for which it is requested.

B.  To be considered for the payments provided for in Paragraph A above for each month that you claim payment is due, you must establish and represent in writing to  the highest-ranking employee in  the Human Resources organization of your EMPLOYER, within fifteen (15) days following the end of each month that you are seeking payment, that although you diligently sought work in the prior month consistent with your obligations under Paragraphs 6 and 7 of the Agreement, you were unable to attain employment from a new employer in a position in which your annual base salary equaled the annual base salary you last received from your EMPLOYER, solely because of a restriction set forth in Paragraph 6 or 7 in the Agreement. You must also submit a completed Application for Payment Pursuant to Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement and promptly provide such further information or documents concerning your job search as your EMPLOYER may request to determine if your employment status is solely due to a restriction set forth in Paragraph 6 or 7 of this Agreement, that a diligent search for employment consistent with your obligations was made, and to verify the accuracy of your representations. As more fully set forth in the Application and this Addendum, in order to establish a diligent search for employment satisfying the requirements of this Agreement, you must demonstrate, among other things, that you made best efforts to secure positions that were in compliance with the terms of the restrictions set forth in Paragraphs 6 and 7 of the Agreement.  For avoidance of doubt, to be eligible for payment under the Agreement, you must demonstrate, among other things, that you sought employment in positions that would not violate your non-compete and non-solicitation obligations under Paragraphs 6 and 7. You must also establish, among other things, that the restrictions set forth in Paragraph 6 or 7 were the sole reason that you could not find employment with commensurate annual base salary and were not due to circumstances unrelated to those obligations including, without limitation, general economic conditions or competition from other candidates.

C. In the event that you are offered a position which you believe conflicts with your obligations under either Paragraph 6 or 7 of the Agreement, you must inform your EMPLOYER so that your EMPLOYER may evaluate the position and consider whether the position may be allowable under the terms of this Agreement or permissible with appropriate restrictions. No payment shall be due under Paragraph A if you fail to make timely application for or to provide on a timely basis any information or documents requested by your EMPLOYER or required under this Addendum or if you provide incomplete or inaccurate information regarding your job search.

D. If your EMPLOYER determines that you are entitled to payment under Paragraph A, your EMPLOYER may elect in its sole discretion, in lieu of payment, to provide you a written release from the restriction of Paragraph 6 or 7 of the Agreement. In the event your EMPLOYER elects to provide such written release, EMPLOYER will no longer be obligated to make any payments contemplated by Paragraph A above.

# EXHIBIT C

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee: Michael Valeri

TO BE PROVIDED BY H.R.

Employee WWID:

### A. Introduction

**DePuy Synthes Sales, Inc.** is one of numerous entities within the Johnson & Johnson Family of Companies. The businesses in which these entities are engaged are extremely competitive. During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below), will develop, maintain or enhance business and/or customer relationships and receive training relating to the business of **DePuy Synthes Sales, Inc.** and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies. This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other entity within the Johnson & Johnson Family of Companies.

This Agreement sets forth your obligations during and after your employment with the COMPANY including, but not limited to, defining certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-competition, non-solicitation of employees and publicity.

### B. Definitions

As used in this Agreement:

**COMPANY** means individually and/or collectively **DePuy Synthes Sales, Inc.,** Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns. An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly.

**EMPLOYER** means **DePuy Synthes Sales, Inc.** or, if applicable, any other COMPANY by which you are (or were) employed at any time. For purposes of this Agreement, after you are no longer employed by any COMPANY, EMPLOYER means any COMPANY by which you were last employed.

**INVENTIONS** means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered, that relate to any work assigned to or performed by you for or on behalf of your EMPLOYER or any COMPANY or to the actual or anticipated research or development or other business activities of your EMPLOYER or any COMPANY.

**CONFIDENTIAL INFORMATION** means information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by the COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated systems, engineering,

1

marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to you or known by you in connection with your employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

**COMPETITOR** means any person or entity including, but not limited to, you or anyone acting on your behalf, (a) that is engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) your use of the specialized training provided to you by your EMPLOYER or any COMPANY; and/or (c) that could benefit from your use of the COMPANY's customer relationships and/or goodwill.

**CUSTOMER** means any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of your employment with any COMPANY.

## C.  Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION, training, your employment or the continuation of your employment with your EMPLOYER, your access to customer relationships and good will, and/or for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, you agree, and intend to be legally bound, as follows:

1.  You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, your EMPLOYER or any COMPANY. Except as otherwise provided in Paragraphs 22, 23 and 24 of this Agreement, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2. All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works, that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and maintain a patent, or trademark or copyright registration or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS, or copyrightable works conceived, reduced to practice, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. You acknowledge that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a COMPETITOR, will cause immediate irreparable injury to the COMPANY. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of your EMPLOYER or any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you will not, directly or indirectly, perform, or assist others to perform, work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by: (a) your disclosure or use of CONFIDENTIAL INFORMATION to which you had access; (b) your use of the specialized training provided to you by your EMPLOYER or any COMPANY for which you have worked; and/or (c) your use of CUSTOMER relationships and goodwill. Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurances satisfactory to the COMPANY with a competitive interest that you will not

render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANY. The restrictions of this Paragraph 6 will not apply with respect to services you render in California after termination of your employment within the COMPANIES that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

7. You acknowledge that the COMPANY's relationships with CUSTOMERS and the goodwill associated with such relationships are important and valuable business assets that results from the COMPANY's significant investment of its time and resources. Therefore, you agree that during your employment and for eighteen (18) months after the termination of your employment (whether voluntary or involuntary) with the COMPANY, you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if you are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if your activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR. For purposes of this Paragraph 7, COMPANY shall mean your EMPLOYER and any COMPANY that you worked for during the last eighteen months of your employment. The restrictions of this Paragraph 7 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8. Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANY, you will not, directly or indirectly, on your own behalf or on behalf of others, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment with the COMPANY. The restrictions of this Paragraph 8 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9. For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, at least two weeks before your last date of employment with your EMPLOYER, and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover ). During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities. You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if applicable) any new responsibilities. You will promptly provide any additional information requested by your EMPLOYER to determine compliance with your obligations under this Agreement. The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those

obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10. If your employment with your EMPLOYER terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures set forth and referenced in Addendum A, which is incorporated by reference herein. If you voluntarily terminate or resign from your employment with your EMPLOYER, then you shall not be eligible for such payments.

11. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any COMPANY, including any computer or electronic equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk or drive) relating in any way to the business of your EMPLOYER or the COMPANY that were entrusted to, created by or obtained by you at any time during your employment with the COMPANY.

12. You acknowledge that your EMPLOYER and/or the COMPANY have a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision to you of specialized training. You further acknowledge that the restrictive covenants contained in this Agreement are reasonably necessary to ensure your EMPLOYER or the COMPANY is able to protect its legitimate interests and, therefore, you agree not to, in any action, suit or other proceeding, deny the reasonableness of, or assert the unreasonableness of, the restrictive covenants and you hereby waive any such defense. In addition, you agree that the restrictive covenants in this Agreement are separate and independent obligations and, therefore, the failure or alleged failure of the COMPANY to perform any obligations owed to you shall not constitute a defense to the enforceability of such restrictive covenants. Accordingly, you acknowledge that if you violate or are about to violate this Agreement, immediate irreparable injury to your EMPLOYER and the COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against you without the necessity of posting any bond.

13. If you breach any of the provisions of this Agreement, the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that you cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach.

14. You agree to indemnify and pay your EMPLOYER and/or any COMPANY for the reasonable attorneys' fees and costs it incurs (including fees and costs incurred before the initiation of litigation, during litigation, and any trials, appeals and/or any petitions) to enforce the terms of the Agreement in the event you violate any of its terms or in the event you unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement.

15. You agree that this Agreement applies to any position that you may hold as an employee of the COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the circumstances of your employment, including without limitation any change in the scope or nature of your responsibilities or assignment, your level or seniority, or your compensation or benefits.

16. You agree that your EMPLOYER may assign this Agreement and all of its rights and obligations. Each COMPANY is an express third-party beneficiary of this Agreement.

17. Nothing in this Agreement shall limit or affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

18. During   your employment, while you may investigate other employment or business opportunities, you acknowledge and agree that you are subject to a duty of loyalty. Therefore, you agree that during your employment, you will not, directly or indirectly, among other things, compete against the COMPANY;   do anything to impair your EMPLOYER's business or relationships with its CUSTOMERS; inform CUSTOMERS that you are terminating your employment and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of your EMPLOYER or any COMPANY to join a COMPETITOR.

19. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules.  Any action that you initiate relating to or arising out of this Agreement must be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey.  You consent to personal jurisdiction and venue in both New Jersey State and Federal courts and to service of process by United States mail or express courier service in any such action. Any litigation initiated by you in any other forum or jurisdiction must be transferred to an appropriate court in New Jersey.

20. You irrevocably consent not to sue the COMPANY in any jurisdiction other than the state or federal courts of New Jersey for the purposes of any action arising out of or related to this Agreement.  You further agree not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state or federal court in New Jersey.

21. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions.  To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

22. The following applies only to a Minnesota employee:  Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

23. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee:  Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the

INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

24. The following applies only to a State of Washington employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

25. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

26. This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them relating to its subject matter. In the event that this Agreement be declared invalid, void, or unenforceable for any reason, then you understand, agree, and acknowledge any non-compete, confidentiality, non-solicitation, and/or non-disclosure agreement previously entered between you and any COMPANY, which was superseded by this Agreement, shall be reinstated and remain in full force and effect. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of the COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

DATE: __Nov 14, 2014__

_____
EMPLOYEE SIGNATURE
**Michael Valeri**
_____
Print Employee Name  (Please Print)
**107 Dickman Drive**
_____
Address
**Lavallette, NJ 08735**
_____
City/State

## ADDENDUM A

A. If, after at least a month following the termination of your employment within the COMPANY, for reasons other than misconduct or your voluntary resignation, and after a diligent search for employment that complies with the terms of the Agreement and this Addendum, you are unable to obtain employment in a position in which your annual base salary is at least equal to your annual base salary at the time of such termination solely because of the restrictions set forth in Paragraph 6 or 7 of this Agreement, then, commencing after submission of an application for payment and any additional requested information and documents and a determination by your EMPLOYER in due course that you qualify for payment, your EMPLOYER shall make monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as annual base salary or (b) the difference between your last annual base salary at your EMPLOYER and your annual base salary in any subsequent position for each month for which you properly apply for payment and your EMPLOYER determines your entitlement. Your annual base salary for or with any subsequent employer will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment. No payment shall be made in advance of the month for which it is requested.

B. To be considered for the payments provided for in Paragraph A above for each month that you claim payment is due, you must establish and represent in writing to the highest-ranking employee in the Human Resources organization of your EMPLOYER, within fifteen (15) days following the end of each month that you are seeking payment, that although you diligently sought work in the prior month consistent with your obligations under Paragraphs 6 and 7 of the Agreement, you were unable to attain employment from a new employer in a position in which your annual base salary equaled the annual base salary you last received from your EMPLOYER, solely because of a restriction set forth in Paragraph 6 or 7 in the Agreement. You must also submit a completed Application for Payment Pursuant to Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement and promptly provide such further information or documents concerning your job search as your EMPLOYER may request to determine if your employment status is solely due to a restriction set forth in Paragraph 6 or 7 of this Agreement, that a diligent search for employment consistent with your obligations was made, and to verify the accuracy of your representations. As more fully set forth in the Application and this Addendum, in order to establish a diligent search for employment satisfying the requirements of this Agreement, you must demonstrate, among other things, that you made best efforts to secure positions that were in compliance with the terms of the restrictions set forth in Paragraphs 6 and 7 of the Agreement. For avoidance of doubt, to be eligible for payment under the Agreement, you must demonstrate, among other things, that you sought employment in positions that would not violate your non-compete and non-solicitation obligations under Paragraphs 6 and 7. You must also establish, among other things, that the restrictions set forth in Paragraph 6 or 7 were the sole reason that you could not find employment with commensurate annual base salary and were not due to circumstances unrelated to those obligations including, without limitation, general economic conditions or competition from other candidates.

C. In the event that you are offered a position which you believe conflicts with your obligations under either Paragraph 6 or 7 of the Agreement, you must inform your EMPLOYER so that your EMPLOYER may evaluate the position and consider whether the position may be allowable under the terms of this Agreement or permissible with appropriate restrictions. No payment shall be due under Paragraph A if you fail to make timely application for or to provide on a timely basis any information or documents requested by your EMPLOYER or required under this Addendum or if you provide incomplete or inaccurate information regarding your job search.

D. If your EMPLOYER determines that you are entitled to payment under Paragraph A, your EMPLOYER may elect in its sole discretion, in lieu of payment, to provide you a written release from the restriction of Paragraph 6 or 7 of the Agreement. In the event your EMPLOYER elects to provide such written release, EMPLOYER will no longer be obligated to make any payments contemplated by Paragraph A above.